IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL ACTION |
| v. | : |
| | : No. 10-776 |
| MAMADOU BARRY | : |

**MEMORANDUM**

**Schiller, J.**                                                                                                    **January 25, 2012**

A jury convicted Mamadou Barry of willfully and maliciously calling in a false bomb threat against his daughter to Philadelphia International Airport. At trial and at a subsequent hearing, Defendant's daughter testified that she had provided a written statement to law enforcement agents, which the Government never provided to Defendant. The Government claims that no such statement ever existed. Currently before the Court is Defendant's post-trial motion for a new trial. For the following reasons, the Court will grant the motion.

**I.     BACKGROUND**

Hadiatou Barry, the daughter of Mamadou, was scheduled to fly to Jamaica to attend her foster mother's wedding. (Aug. 1, 2011 Trial Tr. at 41.) On the evening before her flight, Hadiatou went to her parents' house to see her mother, Adama Barry. (*Id.* at 45-46.) During the visit, after Adama mentioned that she planned to visit her native country of Guinea, Hadiatou took away Adama's green card and passport to prevent her from traveling. (*Id.* at 46-47.) Hadiatou testified that she was concerned about her mother's safety in Guinea due to election-related violence, and that she thought at the time that Adama wanted her to take the papers. (*Id.* at 46-47, 57-58.) After Hadiatou left, however, Adama reported the incident to the police. (*Id.* at 101-03.) Hadiatou testified that

Mamadou was not present during the visit and that she did not speak to him before she arrived at the airport the next morning for her flight to Jamaica. (*Id.* at 48.)

At approximately 9:39 p.m. on the night before Hadiatou's flight, a police dispatcher at Philadelphia International Airport received a telephone call from a man who said his name was Mohamed.[1] (*Id.* at 30-33; Gov't Ex. 1A [June 16, 2010, 9:39 p.m. Call Tr.].) The caller, who was later identified as Mamadou, stated, "I want to notify you with somebody have a bomb in his bag and traveling." (June 16, 2010, 9:39 p.m. Call Tr.; Aug. 1, 2011 Tr. at 49.) He added that the person carrying the bomb was a woman named Hadiatou Barry and that he thought she was traveling to Jamaica in the next week. (June 16, 2010, 9:39 p.m. Call Tr.) Mamadou did not mention during the call that Hadiatou was his daughter, and he refused to speak with a supervisor. (*Id.*) The call came from a number that Hadiatou testified was her father's business phone number. (Aug. 1, 2011 Trial Tr. at 68.) Later the same night, at approximately 10:08, a police officer at Philadelphia International Airport received a second call from a man who was later identified as Mamadou. (*Id.* at 34-35, 49; Gov't Ex. 2A [June 16, 2010, 10:08 p.m. Call Tr.].) During that call, Mamadou provided Hadiatou's date of birth, "[j]ust to make it easy for you." (June 16, 2010, 10:08 p.m. Call Tr.) The call came from a blocked number that was subsequently traced to Mamadou's cell phone. (Aug. 1, 2011 Trial Tr. at 105-06.)

Following these calls, Federal Bureau of Investigation ("FBI") Special Agent John Kirk determined that Hadiatou's flight was scheduled to depart from Baltimore/Washington International Airport ("BWI") the next morning. (*Id.* at 36-38.) Kirk briefed agents at BWI about the bomb threat

---

[1] Mohamed is the English version of the French name Mamadou. (Aug. 1, 2011 Trial Tr. at 67.)

early in the morning on June 17, 2010. (*Id.* at 39-40.) When Hadiatou arrived at BWI later that morning, she was approached by agents and asked to step aside while a dog sniffed her bag. (*Id.* at 43.) She was then questioned for 30 to 45 minutes before the agents permitted her to board her flight. (*Id.* at 43-44.) There is a factual dispute, discussed in greater detail below, as to whether Hadiatou also gave a written statement to the agents that morning. (*Id.* at 64-65; Dec. 7, 2011 Hr'g Tr. at 12, 28.) The agents did not find any explosives in Hadiatou's bag and determined that the threat was not credible. (Aug. 1, 2011 Trial Tr. at 73-75.) Hadiatou testified that she never gave her father any reason to believe she had a bomb in her bag. (*Id.* at 45, 48, 68-69.)

On the same day, a Philadelphia Police Department detective made a recorded call to Mamadou to ask him about the bomb threat. (*Id.* at 80-81; Gov't Ex. 3A [June 17, 2010 Call Tr.].) During the call, Mamadou expressed anger that Hadiatou had taken his wife's travel documents but denied that he had called in the bomb threats. (June 17, 2010 Call Tr.)

When Hadiatou returned from Jamaica, she was again interviewed by agents at BWI. (Aug. 1, 2011 Trial Tr. at 50.) At that time, she identified the voice on the two June 16, 2010 tapes as her father's. (*Id.* at 49.) Hadiatou told the agents she did not get along with her parents because they were strict Muslims who believed she was too Americanized. (*Id.* at 50-51.) She said that her father disapproved of her decision to attend school and her refusal to marry at the age of fifteen. (*Id.* at 51.) Hadiatou also told the agents that she believed her father had made the false bomb threat to prevent her from going to Jamaica and as retaliation for a protection order that she had sought against him. (*Id.* at 59-60, 74.)

Mamadou was arrested by the FBI on November 8, 2010. (*Id.* at 83.) He again denied making the calls when questioned after his arrest, but at trial did not dispute that he had made them. (*Id.* at

26, 83-84.) The Government called Hadiatou as a witness at trial. During cross-examination, Defendant's counsel attempted to impeach Hadiatou by asking why she had not told agents about taking her mother's travel documents when questioned at BWI before her flight to Jamaica. (*Id.* at 64-65.) Hadiatou responded that she had "probably" mentioned the incident in the written statement she gave to one of the agents that day. (*Id.*) The Government had never turned over any written statement by Hadiatou to the defense during discovery. (Aug. 2, 2011 Trial Tr. at 6.) When Defendant's counsel requested the written statement at trial, the Government's counsel agreed to investigate. (*Id.*) "If there's anything that's *Brady*," the Government's counsel said, "we'll live and die by the sword, I guess." (*Id.*) In its closing, the Government argued that Mamadou had called in the bomb threat to prevent Hadiatou from traveling because he was angry she had taken Adama's travel documents, not because he believed Hadiatou might be carrying a bomb. (*Id.* at 21-22.) The Government's counsel described Hadiatou's testimony as "very specific" and "very credible." (*Id.* at 35.) The jury convicted Mamadou of conveying false information about a bomb threat under two federal statutes, 18 U.S.C. § 844(e) and 49 U.S.C. § 46507.

On September 15, 2011, Mamadou filed post-trial motions for dismissal of one of the two counts, judgment of acquittal, and a new trial. The Court granted the motion for dismissal of the count under 18 U.S.C. § 844(e), denied the motion for judgment of acquittal, and deferred a decision on the motion for a new trial pending a hearing on the issue of a written statement by Hadiatou. At a hearing held on December 7, 2011, Hadiatou testified that she had given agents a written, multiple-page statement. (Dec. 7, 2011 Hr'g Tr. at 28.) She could not remember who told her to write the statement or who she gave it to. (*Id.*) While she did not recall every detail of what she wrote, she remembered describing the incident involving her mother's travel documents. (*Id.* at 30.) Brendon

4

Shaffer, a former police detective with the Maryland Transportation Authority assigned to the FBI Joint Terrorism Task Force, testified that he had stopped Hadiatou at BWI and remained with her until she boarded her plane to Jamaica. (*Id.* at 10-11.) He did not remember anyone taking a written statement from Hadiatou during that time, and his report from that day did not mention a written statement. (*Id.* at 12.) After the trial, Shaffer checked his files and asked individuals at the BWI Police Station, the FBI's Baltimore Field Office, and U.S. Customs and Border Protection to check their files. (*Id.* at 12-14.) None of them had any record or recollection of a written statement by Hadiatou. (*Id.*) The week before the hearing, Shaffer also tried to contact the other law enforcement agencies involved that day at BWI—including Immigration and Customs Enforcement, the Federal Air Marshal Service, and the Anne Arundel County Police Department—but they did not respond. (*Id.* at 15-17.) In addition, FBI Agent David Rodski testified that there was no record of any written statement in the FBI's Investigative Data Warehouse and Guardian systems, where all witness statements and reports from law enforcement agencies involved in an investigation are kept. (*Id.* at 19-20.) He admitted, however, that these systems would not contain any records that other law enforcement agencies failed to enter. (*Id.* at 21-22.) During oral argument, the Government took the position that no written statement ever existed and that Hadiatou must have been "confused." (*Id.* at 36, 41.)

II.   **DISCUSSION**

The only evidence in the record that Hadiatou provided a written statement to agents at BWI is her testimony at trial and at the December 7, 2011 hearing. Regardless of the written statement's existence, Mamadou argues that he is entitled to a new trial because Hadiatou was the Government's

key witness on the element of *mens rea* and he was deprived of an opportunity to impeach her credibility. If a written statement was taken, Mamadou contends, the Government's failure to turn it over in discovery or after Hadiatou testified violated his rights under the Due Process Clause and the Jencks Act. If a written statement was not taken, Hadiatou's sworn testimony to the contrary and the Government's present position that Hadiatou was "confused" undermine her credibility as a witness. Because the Court concludes that Mamadou is entitled to a new trial under either scenario, it need not make a finding of fact as to the existence of a written statement.

### A. If a Written Statement Existed, a New Trial Is Warranted

Mamadou argues that if a written statement was taken, the Government violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over the statement in discovery. The government has an obligation under the Due Process Clause to produce any evidence favorable to a defendant, including possible impeachment evidence. *See Brady*, 373 U.S. at 87; *Lambert v. Beard*, 633 F.3d 126, 133 (3d Cir. 2011). When the government has failed to preserve such evidence, there is no due process violation unless "the government (1) acted in bad faith when it destroyed the evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable." *United States v. Jackman*, 72 F. App'x 862, 866 (3d Cir. 2003) (citing *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984)) (internal quotation marks omitted). Based on the evidence presented at the December 7, 2011 hearing, the Court finds that, even if Hadiatou provided a written statement, the Government lost the statement inadvertently and did not act in bad faith. Therefore, there was no *Brady* violation here.

Mamadou also argues that the Government's failure to produce the written statement when requested at trial violated the Jencks Act. The Jencks Act and Federal Rule of Criminal Procedure

26.2 require the court, on motion of the defendant, to order the government to produce any statement by a witness called by the government for direct examination. 18 U.S.C. § 3500. "The purpose of the Jencks Act and Rule 26.2 is to permit a trial lawyer to have the materials necessary to impeach a witness." *United States v. Heilman*, 377 F. App'x 157, 195 (3d Cir. 2010). If the government does not provide the statement when requested, the court should strike the witness's testimony or, in "the interests of justice," declare a mistrial. 18 U.S.C. § 3500(d); *see also* Fed. R. Crim. P. 26.2(e). Such relief is only appropriate, however, if the error committed was not harmless. *See Goldberg v. United States*, 425 U.S. 94, 111-12 (1976); *United States v. Walden*, 578 F.2d 966, 971 (3d Cir. 1978).

In this case, Defendant's counsel moved for Hadiatou's written statement after she testified at trial, and the Government agreed to provide the statement if it could be located. Accordingly, if a written statement was taken, the Government's failure to produce it constitutes a Jencks Act violation, and the Court must consider whether the violation was harmless. "The test for harmless error is whether it is highly probable that the error did not contribute to conviction. Specifically in the context of the Jencks Act, we must analyze the prejudice resulting from the nondisclosure of the [evidence] in terms of its potential usefulness to the defense." *United States v. Zomber*, 299 F. App'x 130, 135 (3d Cir. 2008) (internal quotation marks and citations omitted); *see also Goldberg*, 425 U.S. at 111 n.21 ("Since courts cannot speculate whether [Jencks material] could have been utilized effectively at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases." (internal quotation marks and citations omitted)). The Government disputes the claim that Hadiatou was a key witness at trial and argues that Mamadou did not suffer any prejudice. In order to convict Mamadou under 49 U.S.C. § 46507, the jury had to find, among other elements, that he acted "willfully and maliciously or with reckless disregard for the safety of human life." *See United States v. Cothran*,

286 F.3d 173, 175 (3d Cir. 2002). Hadiatou's testimony supported the Government's theory that Mamadou called in the bomb threat because he was angry about the incident with Adama's travel documents, and the Government emphasized Hadiatou's credibility during its closing, calling her testimony "very specific" and "very credible." (Aug. 2, 2011 Trial Tr. at 35.) The Government points to other evidence in the trial record, such as the recordings of Mamadou's phone calls to BWI, that may have been sufficient to show he acted willfully and maliciously. However, the Court agrees with Mamadou that Hadiatou's testimony was critical to the Government's case as presented at trial. The Court cannot determine what evidence ultimately swayed the jury, or what potentially impeaching material a written statement by Hadiatou might have contained, and thus cannot conclude that the potential Jencks Act violation was harmless.

When the loss or destruction of Jencks material is inadvertent, "the statutory alternatives of striking the witness' testimony or declaring a mistrial are not mandatory, and whether to follow a different course rests with the discretion of the trial judge." *United States v. Jackson*, 649 F.2d 967, 972 n.6 (3d Cir. 1981); *see also United States v. Ferber*, Crim. A. No. 89-448-01, 1991 WL 16751, at *6 (E.D. Pa. Feb. 8, 1991) ("[W]here the Jencks Act is violated through oversight or negligence not amounting to a conscious election, the Court is entitled to apply such a remedy as the justice of the case might require under the circumstances." (internal quotation marks omitted)). As noted above, if Hadiatou provided a written statement, the Court finds that the Government lost it inadvertently. Nonetheless, given the uncertainties in this case, the Court will exercise its discretion to grant a new trial to Mamadou to ensure that justice is served.

### B. If a Written Statement Never Existed, a New Trial Is Warranted

In his motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure,

Mamadou argued that the jury's verdict was against the weight of the evidence because Hadiatou's testimony was not credible. Considering only the evidence presented to the jury at trial, the Court denied this claim. Now, however, the Court must consider Mamadou's request for a new trial in light of new evidence that Hadiatou may not have given a written statement, contrary to her sworn testimony.

Rule 33 of the Federal Rules of Criminal Procedure permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). When considering a Rule 33 motion a court must exercise its own judgment in evaluating the government's case. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Nonetheless, "a district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (internal quotation marks omitted). Additionally, "motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003). In general, newly discovered impeachment evidence cannot provide the basis for a new trial, but a new trial may be appropriate "in situations in which the evidence is more than merely impeaching or in which it severely undermines the credibility of a crucial government witness whose testimony was essential to the government's case." *United States v. Quiles*, 618 F.3d 383, 397 (3d Cir. 2010).

The Court finds that Hadiatou was a crucial Government witness whose testimony was essential to the Government's case as presented at trial. If Hadiatou never provided a written statement, she was at best confused, as the Government maintains, and at worst deliberately

9

untruthful. It is impossible to know the extent to which this would undermine her credibility in the eyes of the jury, or whether the Government's case against Mamadou could survive absent the benefit of Hadiatou's testimony. The Court will therefore grant a new trial under Rule 33.

### III. CONCLUSION

Because the Court concludes that either (1) the Government committed a Jencks Act violation by failing to turn over Hadiatou's written statement, or (2) newly discovered impeachment evidence casts doubt on the credibility of a key Government witness, the Court will grant a new trial to Defendant. An Order consistent with this Memorandum will be docketed separately.